### FARRELL v. FARRELL et al.

(Supreme Court, Appellate Division, First Department. February 17, 1911.)

1. EVIDENCE ( 37*)—PRESUMPTIONS—LAWS OF FOREIGN COUNTRIES.
    In the absence of proof that dower in any form exists in a foreign country where the common law has never been adopted, the court cannot indulge in any presumption as to the extent of a widow's interest in real estate situated in such country.

    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 52; Dec. Dig. § 37;* Appeal and Error, Cent. Dig. § 2959.]

2. WILLS (§ 782*)—RIGHTS OF WIDOW—DOWER—ELECTION.
    Where a resident of New York devised and bequeathed to his wife absolutely all his real and personal property, except his real estate in a foreign country, which he gave to his mother for life, and on her death to his children, and where he committed the children to the wife's charge and authorized his executor to use the proceeds of the real estate left to his mother, if necessary, for the support and education of the children, no dower right remained in the wife under the law of New York in the real estate in the foreign country since the other provisions of the will were inconsistent therewith.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 2018–2033; Dec. Dig. § 782.*]

3. EXECUTORS AND ADMINISTRATORS (§ 219*)—OBLIGATIONS OF ESTATE—CLAIMS OF EXECUTOR.
    Where a widow during the seven years she survived her husband never sought to establish claims of her insane father, or of herself, against her husband's estate, her executor, who was her second husband, was not, as against the claims of the children of the first marriage to the proceeds of a sale of real estate devised to them, entitled to a credit for the amount due her as a creditor of her husband's estate, based on her claims, and as sole heir of her deceased father.

    [Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 760; Dec. Dig. § 219.*]

4. JUDGMENT (§ 822*)—FOREIGN JUDGMENTS—CONCLUSIVENESS.
    A judgment of a court of a foreign country, having jurisdiction of the parties and of the res involved, may not be questioned.

    [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1496–1500; Dec. Dig. § 822.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. WILLS (§ 828*)—DEBTS AND INCUMBRANCES—DEVISE OF LANDS IN FOREIGN
COUNTRY.

A devise by a resident of New York to his children of land situated in
a foreign country is subject to a mortgage on a part of the land and to
the payment of testator's debts.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 828.*]

6. EXECUTORS AND ADMINISTRATORS (§ 267*)—CLAIMS AGAINST ESTATE—IN-
TEREST.

A resident of New York devised to his children land situated in a for-
eign country. The part of the land incumbered by a mortgage was in-
sufficient to pay the mortgage debt. The entire land was sold by the ex-
ecutrix, the widow, and the creditor was paid, and a balance was received
by the executrix and by her executor and used in the business of testa-
tor conducted by the executrix and her executor, as desired by testator
and the executrix. The sale by the executrix was made in good faith to
protect the interests of the children. She had used her own money in
the business which had become profitable. *Held*, that a judgment in fa-
vor of the children against the estate of the executrix for the amount of
the balance, with simple interest on the amount received by the execu-
trix, and with compound interest with annual rests on the amount re-
ceived by her executor, was a proper disposition of the rights of the par-
ties.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 1032–1043 ; Dec. Dig. § 267.*]

Appeal from Special Term, New York County.

Action by Louis Llado Farrell against William J. Farrell, individ-
ually and as executor of Leocadie Farrell, deceased, and others. From
a judgment granting relief to plaintiff, defendant named individually
and as executor appeals, and plaintiff and certain of the defendants
file a cross-appeal. Affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE,
MILLER, and DOWLING, JJ.

Edward W. Hatch, for appellant.

Edward J. McGuire, for cross-appellants.

DOWLING, J. Francisco Llado y Bohera was engaged in the cork
and corkwood business in the city of New York under the style of
Francisco Llado & Co.; he for some years having no partner and be-
ing the sole person interested therein. In 1875 William J. Farrell
entered his employment at the age of 16 years and remained there
until the time of Llado's death, when he had become his bookkeeper
and manager. Llado married Leocadie Lachat and by her had three
children; Francisco, born August, 1878; Louis, born August, 1880;
and Adelaide, born April, 1883.

Francisco Llado owned three parcels of land, situated at his birth-
place, San Feliu De Quixols in the Province of Gerona in Spain,
known respectively as: (1) Lot 44, the "Huerta" or garden, as it is
described in the various instruments hereinafter referred to, compris-
ing 27,342 areas, with the house thereon; (2) lot 22, comprising one
area, adjoining the foregoing, and having a house thereon; and (3)
a parcel not described in any of the documents herein and not involved
in this litigation, but which has passed directly into the ownership of
his three children aforesaid.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Llado obtained his supply of goods largely from a Juan Rifa y Casas, a resident of Spain, to whom he was indebted for goods furnished, and with whom he entered into an agreement on or about May 28, 1881, known as a "preliminary contract," which was to continue until another and more formal one was made,.which was to be when Llado (therein described as also of the town of San Feliu in which Rifa resided) should go to Spain; which voyage he was recited as about to make on the 20th of November, whereupon said contract should cease; if unforeseen circumstances should impede the intend-ed voyage, the contract should cease at the end of the ensuing December, unless it was renewed. This contract was quite full in its recitals as to the methods to be followed in doing business between Rifa and Llado, and by it Llado agreed that he would name no other representative in the Province of Gerona save Rifa, although he reserved to himself the continuation of his business with all and every of his former correspondents. It may be noted here that the contract purports to be made with Francisco Llado & Co., merchants, although it is conceded that Llado solely was the owner of the business.

The fifteenth paragraph of said agreement provided as follows:

"In order to give a guaranty to D. Juan Rifa y Casas, Francisco Llado y Bohera will be liable to him for all with his goods and property, movable and immovable, which he has and shall have in the United States as well as in Spain, and particularly be liable with all that house and lands that he owns in the said town of San Feliu De Quixols, and which is bounded on the east by Calasans street and on the south by the little fort and the beach, and on the west by the house of Anglada and partly by the house of Vidal, and on the north by San Ramin street."

This agreement was duly acknowledged in the city of New York. It was registered in Spain on June 10, 1881, in the register of the authenticating notary Don Joaquin Amettler.

Thereafter, on December 2, 1881, Llado executed a power of attorney in the city of New York, in which he described himself as a merchant and an inhabitant of the city of New York, and acknowledged it before the Spanish Vice Consul, whereby he conferred:

"Power ample, sufficient and complete on Don Joaquin Amettler, writer and notary of the same town of San Feliu De Quixols in order that in his name and in representation of his person as owner of the house Francisco Llado & Co., of New York, he may ratify a preliminary commercial agreement between Don Juan Rifa y Casas of the said town and Francisco Llado & Co. of New York, which commercial agreement is found to have been duly executed with all the necessary formalities according to the laws of contract in force for citizens of Spain in foreign countries. So that said attorney Don Joaquin Amettler may mortgage, if he thinks necessary, and it is the desire of D. Juan Rifa y Casas, in guaranty of the disbursements that he, Don Juan, may make for the purchase of corks in Spain, which corks he shall remit to said Francisco Llado & Co., of New York, as provided in the agreement referred to, to the amount of 10,000 duros in favor of the said Don Juan Rifa y Casas, the same to be always in conformity with all and every of the clauses of the said agreement; which mortgage up to the amount mentioned should be constituted upon the landed property spoken of in article 15 of the agreement consisting of the house, grounds, fences and others mentioned in said article distinguished by the number 44, said house being a ground floor and one story above."

The power then proceeded to describe by metes and bounds lot 44. A duro is the equivalent of five pesetas.

Acting under this power, Don Juan Amettler then proceeded, and on January 30, 1882, appeared before Don Antonio Cassanas y Carendell, notary of the Territorial College of Barcelona and of the district in the Province of Gerona, in company with Don Juan Rifa y Casas; and Amettler, as attorney for Llado, then entered into a written agreement with Rifa, wherein the execution of the preliminary contract hereinbefore referred to was recited, and it was further agreed:

"Wherefore D. Joaquin Amettler in his name confirm and ratify in all its parts the transcribed document, and although by the same it is inferred that it ended in December last, however, taking into consideration the large amount of merchandise that Señor Rifa shipped to Sr. Llado during the past year, the payment for the most of which is yet pending, and with the sole object of securing in every way possible the amount of the same and such as he may ship in the future, the said Sr. Amettler in his said name, leaving protected the legal lien of the government for one year's taxes assessed and not paid, which preference is reserved, he mortgages for the sum of fifty thousand pesetas all of said house and grounds adjoining, designated by the number 44."

Then follows the description of lot 44 by metes and bounds.

Rifa continued shipping goods to Llado, whose business, apparently, was not prospering; for, as the testimony shows, he had been borrowing money from his friends, and hypothecated one of his policies of life insurance for a loan, and one Schwartz had a judgment against him for $1,038.76, an appeal from which was pending undetermined.

In July, 1884, Llado had an aneurism of the heart and sent for Gen. George W. Wingate, his friend and legal adviser, to come to him, believing that his end was near. To him he gave instructions to draw a codicil to his will, as he wished to leave everything to his wife except his Spanish real estate. His will had been drawn December 24, 1879, and by it he left to his mother, Narcissa Llado y Bohera, the life estate in his Spanish realty, at the termination of which he created an estate in his widow in the same property for life or so long as she might remain unmarried, with remainder to his children. All the residue of his property, real and personal, was left to his executors, in trust to pay the income therefrom to his wife so long as she might live or remain unmarried, and upon her death to divide the principal and any remaining income among his children and the issue of any deceased child. He named his friend Gen. Wingate, Francisco S. Patxot of Barcelona, and his wife, to be executors and executrix, respectively, of his will. By the codicil drawn for him by Gen. Wingate and executed July 2, 1884, he gave all his property real and personal, except the real estate in Spain, to his wife for her sole and separate use forever, committing to her charge the custody and education of his children. He further authorized his executors and executrix, or a majority of them, in case it should be necessary for the support and education of his children, to use the proceeds of the real estate left to his mother for life, and for that purpose gave power of sale thereof after his mother's death, and further power of sale as to any other real estate owned by him; the proceeds of such sales to be held by the executors and executrix during the minority of his children and to be applied during such term to their support and education, and the re-

mainder to be divided between them upon their respectively becoming of age.

At the time he gave instructions for the drawing of the codicil, he also stated that he wished to give his wife the three policies of life insurance for $5,000 each which had been issued; two by the Equitable Life Assurance Company, and one in the Mutual Life Insurance Society, one of the former having been assigned to one Herzfeld to secure a loan from him. Wingate told him that he did not know the exact form which would be required by the companies in order to convey title, but that, if Llado would turn over to him the two policies which were in his possession in trust for his wife (Herzfeld having the third), he thought it would be a good gift and would hold in case he died before formal papers could be signed. Thereupon Llado turned the two policies over, saying, "I give these to you for Mrs. Llado." Llado told his wife that he gave them to Wingate, who put them in his pocket and always kept them thereafter. On the following day Wingate visited the offices of the life insurance companies and gave them notice that the policies had been assigned to Mrs. Llado, exhibiting the two policies at the same time. He was advised by the companies that a letter must be signed by Llado showing he had made the transfer. Such letters were prepared by Wingate and given to Llado and the original letter with respect to one of the policies, No. 240,325 in the Equitable Life Assurance Society, dated July 1884, is in evidence, with affidavits made September 3, 1884, by Wingate, setting forth his participation in the gift to Mrs. Llado and in the notice to the companies, as sworn to upon this trial.

The learned trial court evidently did. not consider this testimony as controlling when it said in its opinion that "the contention that the life insurance money should not be treated as assets of the husband's estate was made for the first time upon the trial," and when it found that the money derived from the policies was an asset of Francisco Llado's estate, for the sole evidence to the contrary was an unsworn statement of an accountant, Rollo, in 1889, when he entered in his balance sheets a note as to the policies:

"Mr. Farrell stated that these policies were in the name of Mrs. Llado, but upon inquiry it was found that they were never transferred to his wife. They are accordingly brought in here as belonging to the estate of Mr. Francisco Llado."

Upon this, Farrell, in filing his account as executor of his wife's estate, in March, 1904, followed the account and charged himself with the policies. But there is no testimony to impeach the contemporaneous written evidence or Gen. Wingate's testimony.

After the execution of the codicil to the will, and when he had. been advised that he had but a short time to live, Llado talked with Gen. Wingate regarding the continuation of his business by his wife.

The Rifa mortgage on the Spanish property had been the subject of many conversations theretofore between Gen. Wingate and Llado. At the particular conversation referred to, the question came up as to what arrangements it would be best to make in regard to his debt

to Rifa and the danger that every one apprehended that Rifa might foreclose the mortgage and sell the Spanish property for little or nothing and then come back on the estate for a large deficiency. Gen. Wingate himself was anxious about the possibility of foreclosure, which was the reason why there had been many conversations about this danger. Llado stated that his business was a good one, although it was not possible to pay Rifa's debt out of the assets of the business; but, if it was possible to get Rifa to continue to make consignments, and Mrs. Llado was able to get Farrell to stay with the business, it might be made profitable, and she might be able to support herself and the children out of it comfortably. Llado finally stated that if his health was restored he would endeavor to sell the property in Spain to prevent any danger of its being sacrificed in foreclosure, and a power of attorney was subsequently drawn, August 20, 1884. He had also told Gen. Wingate that he owed money to his wife and to his wife's father, Lachat.

On August 28, 1884, Francisco Llado died in the city of Brooklyn, leaving him surviving his wife, Leocadie, and his three children, Francisco, then about five; Louis, then about three; and Adelaide, then about one. His mother also survived him. The widow alone qualified as executrix. Gen. Wingate, for obvious reasons, declined to become involved in the business difficulties of the decedent.

At the time of his decease, Llado was indebted to Rifa in the sum of $15,315.54 for goods sold, represented by acceptances of nine drafts drawn by Rifa on Llado. The first two of these were taken up by Mrs. Llado after the making of the agreement of September 23, 1884. Five of the others were paid at maturity; the remaining two being paid in the settlement with Rifa on December 22, 1887. Llado was also indebted to August Lachat, the father of Mrs. Llado, for money received and collected on his account, amounting to $6,-505.14, represented by promissory notes, the first of which bore date October 24, 1877, and all shown on Llado's books. He had also borrowed from his wife further sums of money sufficient to make the aggregate of the two accounts $13,445.15, for which Llado had made his notes and placed them in his safe in an envelope marked "Property of Leocadie Llado." They were found so inclosed after his death.

August Lachat had been insane for a number of years and remained in that condition until his death in February, 1891. Mrs. Llado was his only child and sole heir, managed his property, and was administratrix of his estate. James Llado had at one time been a partner of Francisco Llado, who had bought his interest which was paid for by two notes, the first dated January 2, 1878. Neither of these notes had been paid, and suit to recover thereon was pending, for the sum of $3,339.81, with interest, at the time of Llado's death. Further, as has been before stated, a judgment had been obtained by Schwartz for $1,038.76, upon which an appeal was still pending.

Without going at length into the condition of the business, it is obvious that, although the learned court found that Francisco Llado was solvent at the time of his death, that conclusion could be reached

only by including the value of the Spanish property and the amount of the three insurance policies in Llado's life, as well as by disregarding the claims of Mrs. Llado, of her father, and of James Llado; and that from no possible point of view could the business of and by itself be regarded as solvent or as able in its ordinary course to meet its obligations; and this is well shown by Llado's own statements to Gen. Wingate, which are entirely corroborated by the balance sheets of the business itself.

Following out her husband's expressed desire, Mrs. Llado secured the services of Farrell and continued the business; he having a claim against the estate for $375, for money deposited by him with Llado.

On September 18, 1884, Thomas Brugada, who had come to New York City as the representative of his uncle, Rifa, to see about the situation of the business here, entered into an agreement with Mrs. Llado and James Llado, by which it was agreed in the presence of Gen. Wingate and Farrell, and on the representation of Gen. Wingate, that it was not possible to pay the mortgage on the Spanish property; that if Rifa would continue to consign corks to the business then being conducted by Mrs. Llado, as executrix of her husband's estate, and would not then insist upon the payment of the amount due by Llado at his death, she would pay cash or the equivalent of cash as goods were thereafter delivered, and would put $10,000 of the insurance money, being the amount of the policies transferred to her, as capital into the business, and would continue the same. James Llado then agreed that, if Mrs. Llado would stipulate that his mother, Narcissa, should be permitted during her lifetime to enjoy the occupancy of the Spanish property, he would not press his claim which he had theretofore filed against the estate through his attorneys. Thus it will be seen that Mrs. Llado carried into effect the wish of her husband that she should continue the business if she could get Rifa to keep on supplying corks, regardless of the fact that the New York business could not pay his old debts, and if she could induce Farrell to remain in her employ.

Thereafter Mrs. Llado did deposit with the business on September 23 and September 26, 1884, the proceeds of the two insurance policies which had been transferred to her, amounting, respectively, to $5,028.70 and $5,032.72; and these amounts were duly entered in the daybook of the business as loans from her individually. On September 26, 1884, she made a loan, as executrix, to the business of $2,473.73, being the net proceeds of the policy hypothecated with Herzfeld; that particular policy being evidently treated as an asset of the estate of her husband, because she had never had possession of the same personally or through her attorney, and the same was not regarded as having been legally transferred to her.

On October 28, 1884, she made a loan to the business of $2,500, and on November 29, 1884, another of $500; both entries duly appearing in the firm books. Special accounts were opened with her individually on the days of these respective payments, showing aggregate loans by her individually to the firm of $13,061.42. An account was also opened in her name as executrix showing the deposit

of the amount of $2,473.73 from the policy pledged with Herzfeld. It further appears from the books that the proceeds of these loans made by her were drawn against speedily to discharge firm obligations.

On December 31, 1884, at the suggestion of Gen. Wingate, who feared that he might leave and go with some other house, Farrell was taken into partnership by Mrs. Llado. She contributed the entire capital of the business, consisting of her husband's estate, subject to his debts, her insurance moneys, the other money theretofore advanced by her, and the debts due her father and herself. The partnership was formed under the name of Francisco Llado & Co. Farrell contributed no cash, but gave his entire attention to the business. He was to be paid a salary of $1,000 per year, and in addition was to receive one-third of the profits. Mrs. Llado thereafter gave no attention to the business, which was entirely under the direction of Farrell.

In February, 1885, Mrs. Llado was appointed guardian of her three children. On April 28, 1885, an agreement of some kind was made in New York City between Brugada, representing Rifa, and the new firm of Francisco Llado & Co., by which an indebtedness to Rifa was acknowledged of $16,265; but the particulars of this agreement are not in evidence, nor does it appear how that sum was arrived at, nor what the other agreements made between the parties were; although it may well be that that sum represented the original obligation of $15,315.54, plus the interest thereon. This agreement was not produced, and neither side has endeavored to prove its contents. That there was such an agreement is apparent because it was referred to in subsequent documents. On the same day Mrs. Llado sailed for Spain with her three children. On May 20, 1885, title to the Spanish property was duly registered under the Spanish law in the names of the three children. The property thus registered consisted of parcels 44 and 22. The proceedings thereupon recited the will and codicil of Llado, and the title was subject to the life estate of Llado's mother, Narcissa Llado y Bohera. On September 29, 1885, an action was commenced in Spain by Rifa against Leocadie Lachat, widow of Francisco Llado, as executrix of her deceased husband's estate and also as the guardian and curator, and therefore as the legal representative and administrator of her three children, to recover the sum of £3,150 7s. 3d., being the equivalent at the corresponding rate of exchange at that time of 81,325 pesetas and 48 centimes. The amount in English currency set forth as the debt owing by Mrs. Llado, as executrix and guardian, to Rifa was equivalent in American money to about $15,320. On the basis of the value of a peseta (19.3 cents), the claim in Spanish money would represent in American money about $15,695.

The summons having been issued, what is termed in Spanish law an "embargo" was, on December 26, 1885, laid on lots 44 and 22, hereinbefore described. In the original "demand," prayer was made that the court should proceed, in default of payment of the said amount due, to the seizure of the property of said three minors, "be-

ginning by the property mortgaged to the extent of the quantity named, it being understood that said seizure is sufficient to cover the amounts claimed as aforementioned."

Despite the uncertainty which is sought to be created as to the effect of this Spanish decree, it is apparent that it is a proceeding in rem in the nature of an action to foreclose what is in effect a mortgage given to Rifa by Amettler as the duly authorized attorney in fact of Llado to secure the payment of the debt due him by Llado up to the extent of 50,000 pesetas, and, in so far as the property was levied upon under the embargo beyond that amount, it corresponds to some extent to our warrant of attachment.

On December 31, 1885, Farrell having reached Spain, an agreement was entered into between Farrell, Rifa, and Mrs. Llado, quite full, complete, and formal in its details, and under which all former agreements between them were annulled, except the mortgage hereinbefore referred to. Under that, the debt of the firm to Rifa was fixed at £2,273 sterling, and the maximum credit to be extended to the firm was fixed at the sum of $15,000. Most elaborate provisions were made as to the future course of business dealing between them, and it is apparent that all these have reference to the new firm as it then existed, and not to the old firm transactions. The mortgage was continued as security for Rifa's debt. The ratification of the mortgage was, of course, only as to parcel 44, the one originally included therein. The papers in the suit had already been served on Mrs. Llado in Spain. On January 31, 1886, judgment was taken against Mrs. Llado as executrix of her husband's estate and as custodian, representative, and legal administrator of her children for the sum found due, namely, £3,150 7s. 3d., sterling, equivalent to 81,325 pesetas and 48 centimes, in addition to costs and interest, and the sale of the property embargoed was directed. Nothing further appears to have been done in the Spanish suit until March 7, 1887. Meantime, in February, 1886, Mrs. Llado and Farrell returned to America, where they were married on April 26, 1886; both then being about the age of 27 years. They resided in this city, and the children of Llado went to live with them.

In March, 1887, the expert, Pedro Pasquale Baguer, reported to the court the description and value of the two parcels upon which the embargo had been laid. In his opinion, lot 44, which had not been properly improved and produced but little revenue, was of the selling value of 78,742 pesetas and 72 centimes, and lot 22 of 8,750 pesetas and 75 centimes; making a total of 87,492 pesetas and 75 centimes, without making any allowances for the charges of the sale. It will thus be seen that the value of the two parcels, in the opinion of the expert, exceeded by approximately 6,000 pesetas only the amount of Rifa's claim, and that parcel 44, according to his appraisal, was not worth enough to satisfy Rifa's claims. Thereafter the decree of sale was entered which recited the various steps taken in the proceedings, beginning with the execution of the preliminary contract and mortgage by Llado, as the result of which the property, on April 28, 1887, was sold to Thomas Brugada as agent for Mrs. Llado Farrell for

the sum of $14,000. During the time which had elapsed between the commencement of the proceedings and the sale, Brugada had been busy, on Mrs. Farrell's account, endeavoring to procure a purchaser for parts of this property, which had become enhanced in value by reason of the construction of a railroad and the opening of a highway by the municipality on the Mediterranean, in front thereof. In order to enable Brugada to effect the purchase of the property for her, Mrs. Farrell sent him $3,000, which he used in the various preliminaries and for the purpose of making the necessary deposit. As the result of the energetic and faithful efforts of Brugada, purchasers were found for parts of the land, which was finally sold in parcels at prices which enabled Brugada to return to Mrs. Farrell her $3,000, and to pay the purchase price of $14,000, which was turned over to Rifa for his claim against the Llado estate, and which apparently he accepted in full settlement of the amount due him, for he never thereafter made any claim of any kind against the estate. A profit of $6,168.45 was further realized from the sale of other portions of the estate and was remitted by Brugada to Mrs. Farrell and deposited by her in the funds invested in the business, and an additional sum of $1,358.56, which was realized after Mrs. Farrell's death, was remitted by Brugada to Farrell as her executor and also went into the same fund. The $14,000 was credited on the firm's books as a payment by Mrs. Farrell into the firm and was debited against Rifa's account. It is for these two sums of $6,168.45 and $1,358.56 that judgment has been given in favor of the Llado children herein.

In July, 1887, the first of their children was born to Mr. and Mrs. Farrell; the second being born in July, 1889. On August 9, 1887, Narcissa Llado y Bohera died. There is no evidence in the case that her occupancy of whatever house she lived in had been interfered with. On March 19, 1891, Mrs. Llado died, leaving her surviving her husband, William J. Farrell, her three children by Llado, and her two children by Farrell. She left her last will and testament dated January 31, 1888, under which her executor took all her property, in trust, to hold the same during the lifetime of her husband and the minority of any child or children surviving her, and to allow her husband, William J. Farrell, during his lifetime the income and use of the principal of all the estate, real and personal, in such manner as he should see fit, upon the condition that he should support and educate such children as she might leave, during their minority; except that, in case any of such children should marry or be in receipt of a sufficient income from other sources, his obligations towards them should cease. She also charged him with the care and support of her father, August Lachat. She made provision for the distribution of her income upon the death of her husband or in case he should not survive her. She further provided that, after the death of her husband, and upon the youngest of her children becoming of age, the trust should cease and the principal be divided equally between her children. In case her husband should survive her, she authorized the moneys due her by the firm of Francisco Llado &

Co. to remain in their hands. Her husband was made the sole executor of her will, and he duly qualified as such. He continued the business under its former firm name, and in October, 1894, legally adopted the three children of Llado; they taking the name of Farrell, which they still bear. He lived with the five children in the city of New York and took the oldest son into his business as clerk and salesman, where he remained for some seven or eight years, until June, 1906. The children of Llado lived with him until they had all reached, or nearly reached majority. Francisco Llado lived with Farrell until he was 24 years of age, when he married, and his sister, who was then 20, went to live with him. Louis lived with Farrell until he was about 21. There is no question raised here but that Farrell faithfully performed the injunctions of his wife's will and properly supported the children in the home which he maintained.

In 1903, some 12 years after his wife's death, he married again. Since that time there has been much litigation between him and the three children of Llado.

The question directly involved in this action is the amount, if any, which the heirs of Francisco Llado are entitled to receive out of the proceeds of the sale of the two parcels of land in Spain, known as Nos. 44 and 22. The learned court at Special Term has held that the estate of Mrs. Llado Farrell is bound to pay back to her three children by Llado the excess from that sale over and above the $14,000 paid to Rifa, viz., the sum of $6,168.45 paid to her by Brugada, and the sum of $1,358.56 paid by him to Farrell as executor of her estate, with simple interest on the former amount from December 31, 1889, and with interest on the latter amount computed from November 28, 1894, with annual rests as of January 1st in each year; making a total sum up to the date of the entry of judgment, June 25, 1909, of $16,571.29, which was directed to be paid out of the moneys belonging to the estate of Leocadie Llado Farrell invested in the business still conducted by Farrell. According to the books of the firm of Francisco Llado & Co., at the time of its dissolution, the capital account of Mrs. Llado Farrell therein amounted to $39,302.61, whereof $19,256.73 stood to her credit as executrix of her husband's estate, and $20,045.88 to her individual credit. On the settlement of Farrell's accounts as executor of his wife, the referee found that the total amount so invested was $40,265. His report was confirmed by a decree of the surrogate of New York county dated March 17, 1908.

The defendant Farrell, appealing from the judgment herein, claims that the children of Francisco Llado have no right to recover any sum whatever, because the entire proceeds of the sale belonged to Mrs. Llado, on the grounds: (1) That, the moneys of Mrs. Llado having been used to pay the debts of her husband's insolvent estate, her representative should be allowed to offset the same against the claim of the children; (2) that she should be allowed credit for the amount due her as a creditor of her husband's estate; (3) that she was entitled to dower in her husband's Spanish real estate, which right was superior to the mortgage to Rifa (in which she never

joined) and to the rights of the children; and, this amounting to $3,850, she was entitled to the same out of the surplus before anything was due to the children.

As to the question of dower, there has been no attempt made to prove the law of Spain upon the subject. Where an action affected the rights in personal property only of a married woman then resident in this state, the court said, in Savage v. O'Neil, 44 N. Y. 298:

> "There is no proof what the laws of Russia in reference to the property and rights of the married woman were, and there is no presumption that the common law was in force there. Such a presumption is indulged by our courts only in reference to England and the states which have taken the common law from England. The courts cannot take notice of the laws of Russia unless they are proved, and in the absence of proof our own law must of necessity furnish the rule for the guidance of our courts. Monroe v. Douglass, 5 N. Y. 447; 2 Cowen & Hill's Notes (Van Cott's Ed.) 326, 327. Hence, in any view, the law of this state, in reference to the property and the rights of married women, must furnish the rule for the decision of this case."

This case was followed in Crashley v. Press Pub. Co., 179 N. Y. 27, 71 N. E. 258.

But there is in this case not even proof that dower exists in any form in Spain, and the court can indulge in no assumption or speculations as to what the extent or nature of that estate (if any) may be under the laws of a foreign country, where the common law of England has never been adopted. It may, however, be suggested that under the laws of this state no dower right would have remained in the widow in real estate devised as the Spanish property was, in view of all the provisions of the will, which were entirely inconsistent with the existence of such right. With respect to the other contentions made, they are not supported by the course of conduct of the widow during her lifetime, who never sought to establish the claims of her father or herself against her husband's estate, nor endeavored to secure the repayment of any advances made to it by her. On the other hand, the children of Francisco Llado contend by their cross-appeal that they should be paid, out of the money invested in the business, the total amount realized by the sale of the real estate in Spain, including the $14,000 paid to Rifa, with simple interest thereon to the date of Mrs. Farrell's death, and with compound interest thereon thereafter to be charged against Farrell personally. So far as the principal claimed is concerned, the question would be without practical moment to these appellants, were it not that the birth of two children to their mother, the issue of her marriage with Farrell, reduced their share of the mother's estate for an entirety to three-fifths. The present effort, therefore, really is one to secure all the money in dispute for themselves, instead of sharing it with their uterine sisters.

It is difficult to see upon what theory any charge of fraud can be successfully urged against Mrs. Llado Farrell or her husband. We must, to appreciate the situation properly, view it as it presented itself to Mrs. Llado at the time of her husband's death. She was a young woman, with three very young children, and with no knowledge of business affairs. Her father had been insane for years, and

she was, so far as appears, without counsel, advisers, or friends save Gen. Wingate, her husband's legal adviser, and Farrell, his manager. The business, the sole substantial source of income save the New York real estate, was in danger of involving the loss of all the property, if it did not prosper. There was a judgment against her husband; he was largely indebted, apart from ordinary business obligations, to herself and her father; and he had not even been able to pay off the note given when he bought out his brother's interest. He had been obliged to hypothecate a policy of life insurance. It was apparent that unless Rifa, the source of supply of the goods sold by the house, was appeased, and his old debt paid, the business could not continue. Equally important was the retention of Farrell, who alone could keep it going.

Rifa's debt could not possibly be paid out of the New York property of the estate. He was in Spain and had immediately at hand the real estate belonging to Llado, part of which was mortgaged to him to secure his debt, and all of which he could attach, if necessary, to enforce collection of his claim. He, and not Mrs. Llado, was in control of the situation. All that she could hope for was to so arrange matters that he would keep on supplying goods, which Farrell could dispose of, and thus insure a living for herself and her children. We can find nothing in what she did, save an honest effort to act for the best interest of all concerned. She was not even obliged to save the real estate in Spain, nor advance her own money, as she did, to buy it in. She had no defense to the suit of Rifa, which was brought against her in her representative capacity, both as executrix and guardian. No one can now question the judicial proceedings in Spain, and the record shows conclusively that the court had jurisdiction both of the parties and of the res involved. So far as lot 44 was concerned, it had been covered by the mortgage up to 50,000 pesetas; so far as the balance of the equity therein, and the entire title to lot 22, were concerned, they were both liable to meet the balance of the debt. The children took the Spanish property by devise, subject not only to the mortgage to Rifa, but to the payment of all their father's debts. Mrs. Llado could have let Rifa buy in the property, when a deficiency would have subsisted payable out of the New York assets. The appraiser's official report shows how close was the margin of value over Rifa's debt. She risked her $3,000, advanced through Brugada, and authorized him to secure purchasers for parts of the property, endeavoring thus to realize something therefrom. Brugada's influence with his uncle undoubtedly helped to secure delay while this was being done.

Instead of being sacrificed, the property brought more than Rifa's debt and much more than the official appraisal. We cannot believe that she ever meant this transaction for her personal profit. We prefer to regard it as what we find upon the record it was—a purchase by her for the benefit of the estate and of her children which she had indeed made possible by her personal advances and her exertions through Brugada, but which she never claimed to be other than a dealing for the protection of her trust. She risked her insurance

money, the debts due to her and to her father, and other cash in the effort to save something for her children and herself. Her foresight was rewarded by the manner in which Farrell, taking charge of a business relieved from the burden of Rifa's old debt, and in which his activity was stimulated by his participation in its profits, was able to make it a profitable one. In the year 1885, under his direction it earned a profit of $8,251.54, and it seems to have prospered steadily thereafter. After Mrs. Farrell's death, her husband carried out faithfully the injunctions contained in her will in respect to her children. We can find nothing in this case justifying any recovery against Farrell personally.

The sole remaining question has to do with the imposition of compound interest upon the final fund received from the Spanish property, after Mrs. Farrell's death. This was mingled by Farrell with other funds and was not kept separate therefrom, nor had it been invested save in his own business, and at the risk thereof. Under such conditions, compound interest would seem to have been properly charged. Hannahs v. Hannahs, 68 N. Y. 610; Matter of Kernochan, 104 N. Y. 618, 11 N. E. 149.

The judgment appealed from should therefore be affirmed, with costs to the defendant William J. Farrell as executor and trustee. All concur.